**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JANE DOE, a minor, by and through her parent and

natural guardian JOHN DOE,


    Plaintiff,                            Case No.:


v.

THE SCHOOL BOARD OF

DUVAL COUNTY, FLORIDA,

d/b/a DUVAL COUNTY PUBLIC

SCHOOLS; DR. CHRISTOPHER BERNIER,

in his individual capacity;

TAMLA SIMMONS, in her

individual capacity; BRIAN JEFFERSON, in his

individual capacity; SADE

CASPER-REYNOLDS, in her individual

capacity; STUDENT

TRANSPORTATION OF AMERICA, INC.;

and JAMES ROE (STA Bus Driver), in his

individual capacity,

    Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**


Page 1 of 42

**INTRODUCTION**

1. This civil-rights action arises from Defendants' alleged failure to protect a minor female student from escalating sexual harassment and prolonged sexual assaults aboard a DCPS-contracted school bus in September 2024, despite known systemic failures in preventing, classifying, reporting, investigating, and remediating sexual misconduct. After Plaintiff reported the assaults, Defendants allegedly minimized her report, delayed or restricted access to critical evidence, failed to provide victim-centered supportive measures, and shifted burdens onto Plaintiff rather than the perpetrator. Plaintiff asserts claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983, together with supplemental state-law claims. Plaintiff seeks compensatory damages, declaratory and injunctive relief, and attorneys' fees and costs.

2. This Complaint proceeds in four parts. First, it alleges longstanding District notice of deficient reporting, classification, investigation, and remediation of sexual misconduct. Second, it describes the assaults against Plaintiff and the failures in supervision, preservation, Title IX response, and supportive measures that followed her report. Third, it explains how those facts support Plaintiff's federal claims under Section 1983 and Title IX. Finally, it pleads supplemental state-law negligence claims against DCPS, STA, and the bus driver.

**JURISDICTION AND VENUE**

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)-(4), because this action arises under Title IX, 20 U.S.C. § 1681, and 42 U.S.C. § 1983.

4. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2), because one or more Defendants reside in this District, all Defendants are subject to personal jurisdiction here, and a substantial part of the events giving rise to the claims occurred in Duval County, Florida.

6. Divisional venue lies in the Jacksonville Division under Local Rule 1.04, because the events occurred in Duval County.

7. Plaintiff proceeds by pseudonym because she is a minor and the victim of sexual assault. Plaintiff will contemporaneously move for leave to proceed as "Jane Doe" and for her parent and natural guardian to proceed as "John Doe," and will seek to seal or restrict identifying information as required by the Federal Rules of Civil Procedure, this Court's Local Rules, and applicable privacy protections. Defendants have known Plaintiff's identity since at least October 2024, and no Defendant will be prejudiced by pseudonymous filing.

## PARTIES

8. Plaintiff JANE DOE is a minor who, at all material times, attended Stanton College Preparatory School, a selective public high school operated by DCPS, and rode DCPS-supervised transportation to and from school. She brings this action by and through her parent and natural guardian, JOHN DOE. Plaintiff alleges that the District's institutional interest in protecting school and District reputations contributed to the minimization, misclassification, and inadequate remediation of the reported sexual misconduct described below.

9. Defendant THE SCHOOL BOARD OF DUVAL COUNTY, FLORIDA, d/b/a DUVAL COUNTY PUBLIC SCHOOLS ("DCPS"), is the corporate body responsible for operating Duval County's public schools. DCPS receives federal financial assistance within the meaning of Title IX, is a "person" and local governmental entity subject to suit under 42 U.S.C. § 1983, and is a state agency or subdivision for purposes of Fla. Stat. § 768.28.

10. Defendant DR. CHRISTOPHER BERNIER is, and at all material times was, the Superintendent of DCPS and a final policymaker for the District regarding student safety, Title IX compliance, and the policies and customs at issue. He is sued in his individual capacity based on his personal knowledge of and deliberate indifference to the systemic deficiencies alleged herein.

11. Defendant TAMLA SIMMONS is, and at all material times was, a DCPS employee serving as a Title IX Investigator and Vice Principal at Stanton College Preparatory School. Simmons was an "appropriate person" with authority to take corrective action to end the discrimination alleged herein. She was responsible for receiving, classifying, investigating, and responding to the reported sexual assault at issue, and is sued in her individual capacity.

12. Defendant BRIAN JEFFERSON was, at all material times, a sworn law-enforcement officer assigned as a School Resource Officer and/or member of the Duval County School Police. Jefferson controlled access to, and the handling of, evidence relating to the assault and the initial charging decision. Plaintiff asserts an individual-capacity claim against Jefferson based on that conduct.

13. Defendant SADE CASPER-REYNOLDS is, and at all material times was, a Dean at Stanton College Preparatory School with authority over student discipline and the administration of the restrictions imposed on Plaintiff described herein. She is sued in her individual capacity.

14. Defendant STUDENT TRANSPORTATION OF AMERICA, INC. ("STA") is, on information and belief, a foreign corporation that provides student-transportation services to DCPS under contract. As a private, for-profit contractor, STA is not a state agency or subdivision and is not

entitled to sovereign immunity or to the damages limitations of Fla. Stat. § 768.28.

15. Defendant JAMES ROE ("STA Bus Driver") is, and at all material times was, an STA employee or agent who operated the school bus on which the assault occurred. His true name is presently unknown and will be substituted by amendment once ascertained. He is sued in his individual capacity.

## CONDITIONS PRECEDENT

16. All conditions precedent to this action have been performed, have occurred, or have been waived. For the state-law claims, Plaintiff timely served written pre-suit notice under Fla. Stat. § 768.28(6) on DCPS and on the Florida Department of Financial Services by certified mail, return receipt requested, on or about February 3, 2025, and more than 180 days elapsed after service without final disposition of the claim before this action was filed.

17. Plaintiff has satisfied all administrative and statutory prerequisites necessary to maintain the federal claims, which require no exhaustion.

## FACTUAL ALLEGATIONS

### A. *DCPS Knew Its Systems for Handling Sexual Misconduct Were Failing.*

18. For years before the assault, DCPS and its final policymakers had actual and constructive notice that the District's systems for identifying, classifying, reporting, escalating, and remediating serious student

misconduct, including student-on-student sexual misconduct, were deficient and placed students at risk.

19. The Twentieth Statewide Grand Jury of Florida, empaneled after the Parkland school shooting, documented in its Third Interim Report Defendant DCPS's systemic failures in handling and reporting misconduct, including teacher misconduct. The grand jury found that the District's police chief directed officers, through a training presentation, that Chapter 1006 did not require reporting petty acts of misconduct and misdemeanors to law enforcement; that written directives treated offenses including extortion, a felony, and stalking as not requiring reports; and that incidents including sexual molestation were omitted from the data the District forwarded to the Florida Department of Education.

20. In 2023 and early 2024, independent and state-level reviews identified deficiencies relevant to the District's handling of misconduct and reporting obligations, including the February 2023 Sniffen & Spellman report and a January 2024 investigation by the Florida Department of Education, Office of Inspector General.

21. In or about June 2024, an outside-counsel review commissioned by the District, the Weiss Serota Helfman Cole & Bierman report, examined the District's handling of employee misconduct and provided additional notice to the District's final policymakers of the deficiencies alleged herein.

22. In or about August 2024, weeks before the assault, Superintendent Bernier publicly launched the District's "Know the Line" campaign addressing boundaries and sexual misconduct, reflecting the District's and its policymakers' actual awareness of the risk of student sexual misconduct.

23. On August 18, 2020, at 12:14 AM, a former District student emailed Principal Melanie Hammer, identifying twelve educators and reporting that the former student had been sexually abused by District personnel and that other individuals posed a risk of sexual misconduct to students.

24. Hammer asked a senior District administrator, Schneider, "Am I to share this with JSO?" Schneider replied, "You have done what is needed."

25. The District's own information technology forensics later confirmed that Hammer never forwarded the email.

26. The District did not report the 2020 allegations to law enforcement or adequately investigate them.

27. DCPS thereafter failed to make a timely and adequate report and failed to remediate the known risk of sexual misconduct by District personnel. Those failures are documented in the District's own substantiated investigative report and April 16, 2026 written reprimand.

28. The District's own Office of Professional Standards later determined that a senior District administrator "knowingly failed" to report child-abuse allegations he received in 2020 and that the failure allowed students to remain at risk. The District's substantiated investigative report and April

16, 2026 written reprimand found that Schneider had a statutory duty to report during 2020 through 2025; that his conduct was intentional or, at minimum, reckless; that students continued experiencing abuse by educators identified in the 2020 e-mail; that his inaction caused "a systemic breakdown in reporting, compliance, and accountability"; and that the Board "has been sued numerous times based on the conduct of many of the educators listed." Those findings supply direct notice of the same reporting, escalation, and accountability failures alleged here.

29. On or about December 5, 2025, when the Jacksonville Sheriff's Office sought the District's records concerning the 2020 report described above, DCPS, through its Office of General Counsel, declined to produce the 2020 report and the underlying list absent a subpoena, as reflected in Jacksonville Sheriff's Office report CCR 2025-0697670. That refusal is consistent with the District's practice of withholding and concealing records of student sexual misconduct.

30. A Florida Department of Education, Office of Inspector General Investigative Report (No. 2023-0003) determined that DCPS failed to timely report numerous incidents of educator misconduct and that a District Office of Professional Standards supervisor deleted approximately 290 files, including reporting forms and public-records requests.

31. On information and belief, that supervisor signed the District's misconduct transmittals concerning a Douglas Anderson teacher to the Florida

Department of Education on or about March 22 and 23, 2023, before the deletions were discovered, reflecting a custom of underreporting and concealment.

32. Florida law required the District to report defined school-safety incidents, including sexual battery, through the School Environmental Safety Incident Reporting ("SESIR") system. See § 1006.07(9), Fla. Stat.; Fla. Admin. Code R. 6A-1.0017. On information and belief, DCPS systematically underreported and misclassified reportable sexual-misconduct incidents and failed to complete an accurate SESIR report classifying Plaintiff's assault as a reportable sexual offense. The District's own Guardian intake form for the substantiated 2020-list investigation answers the question "Was a SESIR completed?" with "No" and thereby provides documentary corroboration of the custom of non-reporting alleged in this paragraph.

33. In 2015, a minor female student's report that DCPS teacher Corey Thayer had committed sexual misconduct in 2013 was documented by the Duval County School Police Department and DCPS in incident reports that recorded, on their face, "# of Victims: 0" and answered "Any children under 18 involved as a Victim?" with "No," although the complainant was a minor student and the accused was a school employee. The District's Office of Professional Standards investigation interviewed six randomly

selected students, did not interview the accuser or her mother, and closed with a letter the District itself described as not a letter of reprimand.

34. In April 2023 and again in September 2023, DCPS removed Thayer from the classroom after the parents of a former student re-reported the 2013 accusation. The internal review, conducted by David Farcas of the Office of Professional Standards, again did not interview the accuser or her mother and closed with a non-disciplinary "coaching and counseling" letter that the District described as neither a letter of reprimand nor a form of discipline. On August 16, 2023, Farcas confirmed by telephone to the complainant's mother that Thayer had been returned to the classroom after a one-month review.

35. The complainant gave sworn testimony to a District investigative panel on October 10, 2023, yet Florida Department of Education administrative materials in the Thayer matter characterized her as "uncooperative." Thayer resigned from DCPS in June 2024. As publicly reported, the Board reached a settlement with the Thayer accuser in or about August 2024, and in December 2024 the Florida Department of Education administratively suspended Thayer's teaching license.

36. Nearly a decade after the 2015 misclassification, the Duval County School Police Department applied the same coding to Plaintiff's matter: Incident Report No. 2025-92504149, concerning the September 30, 2024 sexual assault of Plaintiff, recorded "0" victims, and a March 13, 2025 incident

report characterized John Doe, Plaintiff's father and natural guardian, as "uncooperative," the same label the Florida Department of Education applied to the Thayer complainant. These parallels show a District documentation and minimization practice that has persisted from at least 2015 through the District's handling of Plaintiff's report.

37. In May 2024, DCPS confirmed in response to a public records request that its Human Resources department maintained no training records, no certification requirements, and no third-party training provider for personnel responsible for Title IX and professional-standards investigations, notwithstanding that such personnel, including Farcas and investigator Hayley Traback, conducted those investigations.

38. These facts gave DCPS notice before Plaintiff's assault that its sexual-misconduct response systems suffered from training, reporting, classification, preservation, and accountability failures. The District nevertheless failed to implement adequate policies, training, supervision, documentation controls, evidence-preservation procedures, and corrective measures reasonably calculated to prevent those failures from recurring in Plaintiff's case.

39. The District rewarded this documented pattern and practice of concealing and minimizing employee misconduct with promotion, not discipline. After the Thayer matter became public, after the Florida Department of

Education Office of Inspector General issued its findings concerning the Office of Professional Standards, after the August 2024 Thayer settlement, and after the December 2024 license suspension, DCPS retained Farcas in the Office of Professional Standards and then promoted him to Supervisor. The District disciplined no employee in connection with the Thayer matter.

40. Superintendent Bernier approved or acquiesced in the retention and the promotion.

41. Those failures were not isolated. They reflected District customs and practices of minimizing, misclassifying, underreporting, and inadequately investigating reports of student sexual misconduct, with deliberate indifference to students' constitutional and statutory rights.

42. The District's later policy choices further support prospective injunctive relief. On July 1, 2026, the District's Board adopted the 2026-27 Student Code of Conduct, publicly posted by the District, which escalates first-offense discipline for a student found to have made a proven false accusation of defamation of character against an employee to penalties exceeding those the same Code imposes for first-offense stalking or physical sexual harassment. Plaintiff alleges this later policy as evidence of the District's continuing institutional posture, ratification, chilling effect, and need for prospective injunctive relief, not as an independent

damages theory or as the sole basis for causation for the September 2024 assaults and the events that followed.

**B.      *Plaintiff, the Setting, and the Perpetrator.***

43.   At all material times, Plaintiff was a ninth-grade student at Stanton College Preparatory School and rode a DCPS-contracted school bus operated by STA under Defendants' custodial supervision.

44.   On information and belief, discovery is expected to show that, before the assault, District personnel had notice of prior sexually inappropriate conduct by the perpetrator or similar conduct sufficient to make further sexual misconduct on District transportation foreseeable. Despite that notice, District personnel permitted him continued unsupervised access to female students.

**C.      *The Escalating Harassment and the September 30, 2024 Assault.***

45.   During several weeks in September 2024, the perpetrator subjected Plaintiff to escalating sexual harassment aboard the school bus.

46.   In or about early to mid-September 2024, the perpetrator grabbed Plaintiff's breast over her clothing, giving Plaintiff reason to fear further sexual contact during subsequent bus rides.

47.   On or about September 24, 2024, on the ride home, after Plaintiff's friend exited the bus at his stop, the perpetrator, a male student, directed Plaintiff to move and sit next to him at the back of the bus. When Plaintiff moved to the aisle seat, the perpetrator turned to face her, struck at her chest in a

mock punching manner, then grabbed her breasts and moved his hands beneath her shirt and undergarment, touching her bare skin. The assault continued for several minutes until the bus reached Plaintiff's stop and she rushed off the bus. Plaintiff felt shocked and helpless. Between this incident and the third, Plaintiff attempted to avoid the perpetrator.

48. On or about September 30, 2024, in the third and most egregious of these incidents, the perpetrator subjected Plaintiff to another prolonged sexual assault aboard the school bus. The assault continued for several minutes while Plaintiff, seated and unable to get away, verbally objected and told the perpetrator that the bus had cameras, and he did not stop. In her written Title IX addendum, Plaintiff contemporaneously described this assault as "the worst 7-10 minutes of my life."

49. As a minor, Plaintiff was legally incapable of consenting to the perpetrator's conduct under Florida law.

**D.     *The Bus Driver's Opportunity to Intervene and Failure to Act.***

50. During the third assault, the perpetrator asked the bus driver about his water thermos. The driver, while operating the bus, searched the floorboard area, eventually located the thermos, and then called back out to the perpetrator to get his attention. The perpetrator stopped assaulting Plaintiff, who pulled her shirt back down, and took the thermos from the driver, who looked directly at him. Within approximately thirty seconds,

the perpetrator resumed the assault. The driver thus directly engaged and observed the perpetrator in the midst of the assault.

51. During the third assault, the perpetrator was seated beside Plaintiff. It was after he was seated there that he asked the bus driver about the thermos.

52. From the driver's seat, the driver had a clear and unobstructed view of the seat where the perpetrator sat beside Plaintiff simply by turning his head. The bus's interior mirror also afforded the driver a view of the perpetrator's seating area; during the earlier incidents that view included at least the top of the perpetrator's head. The surveillance footage, as viewed by Plaintiff's family, shows that during the third assault the driver looked into the interior mirror more than once, glanced toward the perpetrator at least once, and, during the thermos handoff, looked directly at the perpetrator while the assault was ongoing.

53. But for the bus driver's failure to monitor the bus and intervene after directly engaging with and looking at the perpetrator during the assault, and after having a clear and unobstructed view of him with a turn of the head, the assault would not have occurred, would have been interrupted sooner, or would have been materially less severe.

**E.** *The Report and Handling of the Surveillance Footage.*

54. On or about October 17, 2024, Plaintiff submitted a written, first-hand report of the assault to school administrators.

55. On or about October 30, 2024, Plaintiff submitted a written addendum to her Title IX complaint describing all three incidents, including her statement that she told the perpetrator the bus had cameras; the addendum was received and signed by Defendant Simmons.

56. On or about October 24, 2024, Plaintiff's family submitted a written request to preserve all bus surveillance footage.

57. Despite that written request, the foreseeable evidentiary significance of the footage, and the known short retention window for bus surveillance footage, Defendants failed to promptly preserve, retrieve, secure, or provide meaningful access to the footage.

58. The footage was not retrieved until in or about mid-November 2024.

59. Defendants permitted Plaintiff's family to view the footage only once and only in the presence of two law enforcement officers; Defendant Jefferson, who controlled access to the footage, was not present at the viewing.

60. The District has acknowledged that the bus surveillance footage exists and remains in its possession. On April 11, 2025, the District's Office of General Counsel confirmed in writing that four video recordings from afternoon bus number 574 captured Plaintiff's rides home on September 9, 24, 25, and 30, 2024. The District stated that Plaintiff could view all four recordings but would not receive copies absent suit and a court order.

61. Defendant Jefferson's own incident report, submitted on March 14, 2025, affirmatively answered 'NO' to the question 'Is there Body Worn Camera (BWC) footage for incident?'

62. The original JSO incident report for the same incident, prepared by the responding officer and submitted on October 19, 2024, answered the same question 'YES.' No body-worn-camera footage, activation logs, audit trail, retention record, or metadata has ever been produced, and Defendants have never reconciled the two reports.

### F.    *Preservation of Evidence and Spoliation.*

63. By October 24, 2024, and no later than receipt of Plaintiff's written preservation request, Defendants reasonably anticipated litigation and had a duty to preserve relevant evidence, including bus-surveillance footage, body-worn-camera materials, activation logs, audit trails, metadata, incident reports, communications concerning the report, Title IX records, discipline records, transportation records, and any records reflecting access to or handling of the evidence. The conflict between the original responding officer's report, which indicated that body-worn-camera footage existed, and Defendant Jefferson's later report, which denied it, remains unexplained, and no such footage has ever been produced.

64. Defendants failed to implement a litigation hold or otherwise take reasonable preservation steps reasonably calculated to secure the surveillance footage, body-worn-camera materials, audit information,

metadata, and related communications before expiration of ordinary retention periods or before evidence became unavailable.

65. The loss, nonproduction, delayed retrieval, restricted viewing, or absence of preservation records for this evidence prejudiced Plaintiff's ability to prove the full duration of the assault, the bus driver's opportunity to observe and intervene, the timing and adequacy of Defendants' response, and Defendants' handling of Plaintiff's report. Plaintiff therefore seeks all remedies available for spoliation or failure to preserve evidence, including appropriate evidentiary sanctions, adverse inferences, and related relief.

66. Plaintiff pleads the preservation failures both as part of Defendants' unreasonable post-report response and as a basis for evidentiary remedies, including adverse inferences, sanctions, and related relief. The same failures also support Plaintiff's negligence theories because they reflect operational breakdowns in implementing known evidence-preservation and student-safety duties after a foreseeable litigation trigger.

### G.   *Minimizing The Report and Ignoring Title IX and Reporting Obligations.*

67. Defendant Tamla Simmons, the District's Title IX Investigator and a Vice Principal, minimized Plaintiff's report. In an October 31, 2024 email, Simmons wrote, "It's never a dull day around here," characterizing the reported sexual assault of a minor as an ordinary administrative matter rather than a student-safety emergency.

68. On or about November 11, 2024, Simmons, through her school messaging account, emailed Plaintiff's mother to request an "Impact Meeting" concerning Plaintiff's declining first-quarter grades, treating trauma-driven academic decline as an ordinary performance problem, without referencing the assault, Title IX, supportive measures, or remedies.

69. Defendants treated the educational impact of the assault as an academic-performance issue rather than a Title IX emergency requiring supportive measures and remediation.

70. Defendants failed to report the suspected abuse of a minor to the Florida Department of Children and Families as required by Fla. Stat. § 39.201.

71. Defendants failed to conduct a prompt, equitable, and adequate Title IX investigation; failed to provide supportive measures; and failed to take corrective action reasonably calculated to end the harassment and remedy its effects.

## H.    *The Charging Decision, the State Attorney, and the Guilty Plea.*

72. Defendant Jefferson initially directed that the offense be reduced to a juvenile civil citation and diversion rather than charged according to its nature: the perpetrator received a juvenile civil citation, and the matter was routed into the Fourth Judicial Circuit's Teen Court diversion program, despite the nature of the conduct and Plaintiff's status as a minor victim.

73. Plaintiff's family objected in writing to Teen Court diversion on November 13 and 14, 2024, and asked that the matter be handled in the regular

criminal process. Only after that objection did the Office of the State Attorney assume jurisdiction over the matter.

74. The perpetrator was thereafter arrested and pleaded guilty to felony battery.

75. Despite that corroboration, Defendants declined to correct their records, revisit the Title IX determination, or reassess their handling of the matter. Defendants continued to apply consent-based reasoning that was unavailable as a matter of law because Plaintiff was a minor.

76. After Plaintiff reported the assault and Defendants implemented no protective measures, Plaintiff sat near her cousin, who rode the same bus, for safety and support. On or about November 12, 2024, the perpetrator's mother "expressed concerns" to the school about Plaintiff sitting near her son.

77. In response to the perpetrator's mother's complaint, Plaintiff was summoned that same day to the Assistant Principal's office, where Defendant Simmons and Defendant Casper-Reynolds were present. Plaintiff's parents were not notified, and neither they nor Plaintiff's counsel were given any opportunity to attend. Plaintiff explained that she sat near her cousin for safety and support, not near the adult employee who had failed to protect her.

78. Following that meeting, school officials imposed a "stay away agreement" and related restrictions on Plaintiff, the reporting victim, rather than on

the perpetrator. Plaintiff was required to sit at the front of the bus, in the area where the assault occurred; Defendant Casper-Reynolds "reiterated to Jane Doe, per the agreement, you are to sit at the front of the bus as close as possible to the bus driver"; Defendant Casper-Reynolds also told Plaintiff, referring to the morning bus ride, that "we need you to sit at the front of the bus so the bus driver can see you"; school staff called Plaintiff's fourth period class each day to ask whether she would be riding bus #574; Plaintiff was required to report to a dean each school day, and was excluded from common areas of the school.

79. These measures singled Plaintiff out before other students and recast punitive restrictions as supportive procedures.

80. The District used its Hearing Office Stay Away Agreement, a form designated for conferences with an offending student and parent, but completed it with Plaintiff, the reporting victim, as the subject student; obtained her signature without a parent's; threatened Alternative Center Placement for violations; and assigned Defendants Simmons and Casper-Reynolds to monitor her compliance.

81. District records also show that the burden shifted from the respondent to Plaintiff: the Form 1F Supportive Measures Tracking Sheet initially stated that the respondent would board last and sit close to the driver, but the later Investigative Report and typed notes required Plaintiff to sit at the

front of the bus and documented daily inquiries to enforce separation with fidelity.

82. The same pattern extended to the male student witness who supported Plaintiff's report: he received a Level II disciplinary referral, while the perpetrator faced no comparable school discipline despite his felony arrest and guilty plea.

83. On November 12, 2024, Defendant Simmons sent Plaintiff a Notice of Request for Interview.

84. On November 13, 2024, Plaintiff's parents, having concluded that the school was building a disciplinary case against their daughter in retaliation for her report and her persistence in telling the truth about her assault, rather than protecting her, withdrew Plaintiff from Stanton College Preparatory and enrolled her in Florida Virtual School, ending her participation in the selective academic program to which she had earned admission.

85. Plaintiff's withdrawal was a foreseeable consequence of Defendants' refusal to provide meaningful safety measures, their decision to impose burdens on Plaintiff after she reported the assault, and the resulting loss of safe and equal access to Stanton College Preparatory School.

## I. Harm to Plaintiff.

86. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer educational harm, including loss of access

to educational opportunities and benefits, declining academic performance, the denial of supportive measures, her constructive withdrawal from Stanton College Preparatory School on November 13, 2024, and the loss of her place in the selective academic program to which she had earned admission. Plaintiff's educational harm resulted from the cumulative effect of the assault, the post-report burdens and restrictions imposed on her, and her forced transfer to Florida Virtual School.

87. As a direct and proximate result of Defendants' conduct, Plaintiff suffered psychological and emotional injury, humiliation, anxiety, loss of enjoyment of life, and related damages, together with economic losses including the cost of care and treatment.

## LEGAL THEORY OVERVIEW

Plaintiff pleads the federal claims cumulatively and, where appropriate, in the alternative. The Section 1983 equal-protection claims challenge sex-based differential treatment, deliberate indifference, unconstitutional policies or customs, and individual state-actor conduct. The Title IX claims challenge DCPS's institutional response as a federal-funding recipient to known sexual harassment and to protected reporting activity. The negligence claims challenge operational failures in supervision, transportation safety, reporting, evidence preservation, training, and implementation of existing student-safety obligations.

## COUNT I
## 42 U.S.C. § 1983: Fourteenth Amendment Equal Protection / Municipal Liability
## (Against DCPS)

88. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

89. Plaintiff had a clearly established right under the Equal Protection Clause of the Fourteenth Amendment to be free from sex-based discrimination, including sexual harassment and assault, while attending and being transported by a public school.

90. Count I does not merely repackage the Title IX response theory. It alleges that DCPS maintained and ratified customs of sex-based minimization, misclassification, underreporting, inadequate investigation, and burden-shifting that treated female reporting victims less favorably in safety, discipline, evidence handling, supportive measures, and corrective processes.

91. DCPS's Monell liability is pleaded through several related but independent paths: an official custom or practice of minimizing and misclassifying sexual-misconduct reports; failure to train, supervise, and discipline personnel responsible for Title IX, transportation, school-police, professional-standards, and reporting functions; final-policymaker notice and inaction after repeated documented warnings; and ratification of the

unconstitutional handling of sexual-misconduct reports after the District knew of the recurring pattern.

92. DCPS was deliberately indifferent in failing to train and supervise its administrators, Title IX personnel, and school police regarding the proper handling of sexual-misconduct reports, where the need for such training was obvious and the failure was likely to result in the violation of students' constitutional rights. City of Canton v. Harris, 489 U.S. 378 (1989).

93. DCPS's final policymakers, including the Superintendent and the Board, had actual notice of these deficiencies through the investigations, reports, incidents, and public actions described above. Despite that notice, DCPS failed to correct the deficiencies, failed to train and supervise personnel adequately, and ratified the unconstitutional handling of sexual-misconduct reports.

94. DCPS's conduct after Plaintiff's report, including the Board's July 1, 2026 adoption of the Student Code of Conduct revision described in paragraph 42, sheds light on the policies and customs that were allegedly in place in September and October 2024, supports Plaintiff's request for prospective injunctive relief, and evidences ratification and a continuing institutional posture. Plaintiff does not rely on the later policy as an independent damages basis or as the sole basis for causation for the September 2024 assaults. Salvato v. Miley, 790 F.3d 1286 (11th Cir. 2015).

95. Before Plaintiff was assaulted, DCPS had notice that its systems for reporting, classifying, investigating, preserving evidence, and remediating sexual misconduct were deficient. DCPS failed to correct those known deficiencies. As a result, officials in Plaintiff's case allegedly minimized the report, delayed or restricted access to critical evidence, withheld victim-centered protective measures, and imposed burdens on the reporting female student rather than on the perpetrator. That policy-or-custom chain was the moving force behind the deprivation of Plaintiff's equal-protection rights.

96. The pleaded sex-based discrimination is not limited to the perpetrator's conduct. It includes DCPS's alleged institutional pattern of minimizing reports by female students, treating the reporting female victim as the source of disruption, imposing safety burdens on her rather than on the male perpetrator, and applying discipline and investigative processes more harshly to Plaintiff and a supporting witness than to the perpetrator.

97. In the further alternative, DCPS is liable because its final policymakers, with knowledge of the pattern of failures described in paragraphs 19 through 41, including the District's own disciplinary finding that a senior administrator's actions and inactions led students to continue experiencing abuse, adopted and ratified the practice of minimizing and misclassifying student reports of sexual misconduct as the District's official way of doing business. With full knowledge of those substantiated findings of a six-year

failure that let students continue to be abused, the Board's response was its mildest available sanction: a written reprimand issued expressly "instead of a reduction of pay, or dismissal."

98. Title IX does not preclude this § 1983 equal-protection claim. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).

99. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, including emotional-distress and compensatory damages recoverable under § 1983, together with declaratory and injunctive relief and attorneys' fees under 42 U.S.C. § 1988.

**COUNT II**
**42 U.S.C. § 1983: Fourteenth Amendment Equal Protection / Individual-Capacity Liability**
**(Against Simmons, Jefferson, and, in the alternative, Bernier)**

100. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

101. At all material times, Bernier, Simmons, and Jefferson acted under color of state law.

102. Defendant Bernier, as Superintendent and final policymaker during the relevant period, had actual notice of systemic deficiencies in the District's handling of sexual-misconduct reports, including through the investigations, reports, and public "Know the Line" campaign alleged above. Plaintiff pleads Bernier's individual liability in the alternative and

primarily relies on these allegations to establish DCPS's policymaker notice, deliberate indifference, and Monell liability.

103. Defendant Simmons, as Title IX Investigator and Vice Principal with authority to take corrective action, had actual knowledge of Plaintiff's report, minimized the reported assault, failed to ensure a prompt and adequate Title IX response, failed to provide appropriate supportive measures, and treated the educational impact of the assault as an academic-performance issue rather than sex-based discrimination requiring remediation.

104. Simmons also participated in the post-report conduct described in paragraphs 76 through 85, including the November 12, 2024 questioning of Plaintiff without parental notification and the interview demand directed at Plaintiff, which constituted additional differential treatment of and deliberate indifference toward Plaintiff.

105. As to Jefferson, Plaintiff alleges that he controlled access to critical evidence, restricted Plaintiff's access to the surveillance footage, failed to reconcile conflicting body-worn-camera records, and initially minimized the charging path despite Plaintiff's status as a minor. As to Bernier, Plaintiff pleads individual liability in the alternative based on policymaker notice and deliberate indifference, while primarily relying on those allegations to establish DCPS's Monell liability. The individual-capacity

claims therefore rest on each Defendant's own alleged conduct, knowledge, authority, and causal role.

106. Plaintiff's right to be free from sex-based discrimination by school officials, including deliberate indifference to sexual harassment and assault and discriminatory minimization of a reported sexual assault, was clearly established at the time of the conduct. Hill v. Cundiff, 797 F.3d 948, 970-74 (11th Cir. 2015); C.W. v. Smith, 178 F.4th 1278 (11th Cir. 2026) (denying qualified immunity to a school official who, after a reported sexual assault, disparaged the reporting student and changed nothing; post-report conduct alone supports the deliberate indifference inference); Doe v. Sch. Bd. of Broward Cty., 604 F.3d 1248, 1263 (11th Cir. 2010); Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1304 (11th Cir. 2007).

107. Simmons is not entitled to qualified immunity at the pleading stage because the Complaint alleges her direct participation, actual knowledge, authority to act, and conduct that a reasonable school official would have understood to violate clearly established equal-protection rights.

108. To the extent the claim proceeds against Bernier individually, the same clearly established principles apply to his alleged deliberate indifference after actual notice.

109. Jefferson likewise is not entitled to qualified immunity at the pleading stage, because the Complaint alleges his direct participation, his actual

knowledge of the reported sexual assault of a minor, and conduct, including minimizing the offense and restricting the victim's access to the evidence of her own assault, that a reasonable school police officer would have understood to violate clearly established equal-protection rights.

## COUNT III
### First Amendment Retaliation Under 42 U.S.C. § 1983
### (Against Simmons and Casper-Reynolds, individually)

110. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

111. At all material times, Defendants Simmons and Casper-Reynolds acted under color of state law.

112. Plaintiff engaged in activity protected by the First Amendment, including her written October 17, 2024 report of the sexual assault and her and her family's advocacy for a lawful response to that report, including their requests for preservation of evidence, supportive measures, and an adequate Title IX response.

113. Defendants Simmons and Casper-Reynolds took adverse actions against Plaintiff that would likely deter a person of ordinary firmness from continuing to engage in protected activity, including the victim-only "stay away agreement" and related restrictions described in paragraphs 76 through 79; the questioning of Plaintiff conducted without parental notification; the singling out of Plaintiff before other students; the

Page 31 of 42

summoning of Plaintiff's parents to a grades-focused "Impact Meeting"; and the interview demand directed at Plaintiff, culminating in Plaintiff's constructive withdrawal from Stanton College Preparatory School on November 13, 2024. Bennett v. Hendrix, 423 F.3d 1247, 1254 (11th Cir. 2005).

114. A causal connection exists between Plaintiff's protected activity and Defendants' adverse actions. Defendants knew of Plaintiff's report and her family's advocacy, took no meaningful protective action in response to it, but acted immediately when the perpetrator's mother complained about Plaintiff, imposing same-day restrictions on Plaintiff that burdened only Plaintiff's access to school and transportation and imposed no comparable burden on the perpetrator. That sequence, differential treatment, and departure from victim-centered protective practice support the inference of retaliatory motive and defeat any characterization of the restrictions as neutral safety measures at the pleading stage.

115. To the extent Defendants contend that the Impact Meeting and the interview demand addressed only Plaintiff's academic performance, Plaintiff's academic decline resulted from Defendants' own failure to provide supportive measures after the assault, and any such proffered justification does not defeat causation.

116. At all material times, it was clearly established in the Eleventh Circuit that a government official may not retaliate against an individual for exercising

rights protected by the First Amendment and that adverse action likely to deter a person of ordinary firmness from exercising those rights is actionable. Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005). Defendants Simmons and Casper-Reynolds are therefore not entitled to qualified immunity.

117. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, including emotional-distress and other compensatory damages recoverable under 42 U.S.C. § 1983, together with attorneys' fees and costs under 42 U.S.C. § 1988.

## COUNT IV
### Title IX: Student-on-Student Sexual Harassment / Deliberate Indifference (Against DCPS)

118. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

119. DCPS is a recipient of federal financial assistance and is subject to Title IX.

120. DCPS exercised substantial control over both the harasser and the context in which the harassment occurred because the assault occurred during DCPS-contracted student transportation to or from a DCPS school.

121. An appropriate person, meaning an official with authority to take corrective action to end the discrimination, had actual knowledge of the sexual harassment and assault of Plaintiff. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998).

122. DCPS acted with deliberate indifference to known acts of harassment because its response was clearly unreasonable in light of the known circumstances. DCPS delayed preservation and retrieval of surveillance footage, allowed only a single supervised viewing, minimized Plaintiff's report, failed to provide supportive measures, failed to take corrective action reasonably calculated to end the harassment and remedy its effects, and refused to revisit its determination after the perpetrator's guilty plea. DCPS's response was also clearly unreasonable because, after Plaintiff's written report, it refused or failed to provide any safety accommodation, including separation from the perpetrator on the bus, alternative transportation or scheduling, an escort, a counseling referral, or any measure placing the burden of protection on the perpetrator rather than on Plaintiff. None of these measures was provided. Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999).

123. DCPS's deliberate indifference caused Plaintiff to undergo harassment, made her vulnerable to further harassment, and effectively barred her access to educational opportunities and benefits. The causal chain is direct: DCPS knew of the reported sexual assault, failed to provide protective measures or a reasonable Title IX response, shifted separation burdens onto Plaintiff, and thereby caused loss of safe transportation, academic decline, constructive withdrawal from Stanton College Preparatory School, and loss of participation in the selective academic program to

which Plaintiff had earned admission. Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282 (11th Cir. 2007).

124. As a direct and proximate result, Plaintiff suffered economic and educational harm, including loss of access to educational opportunities and benefits, the costs of remediation, and other compensable non-emotional-distress losses available under Title IX, together with declaratory and injunctive relief and attorneys' fees under 20 U.S.C. § 1681 and related authority. Plaintiff does not seek emotional-distress damages under Title IX.

## COUNT V
### Title IX: Retaliation for Reporting Sexual Assault and Seeking Protected Remedies
### (Against DCPS)

125. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

126. Plaintiff and her family engaged in activity protected by Title IX, including reporting the sexual assault, requesting preservation of evidence, objecting to civil citation or diversion treatment, requesting a Title IX response and supportive measures, and advocating for Plaintiff's educational access and safety.

127. DCPS took materially adverse action in response, including withholding supportive measures, restricting access to evidence, reframing trauma-related academic decline as ordinary academic performance, disregarding

Plaintiff's educational harm, refusing to revisit its findings after the perpetrator's guilty plea, imposing victim-only restrictions after the perpetrator's mother complained, questioning Plaintiff without parental notice, and initiating interview demands directed at Plaintiff rather than at the conditions that enabled the assault. DCPS also applied its policies disparately: the complaint against Plaintiff produced same-day restrictions on the reporting victim, while Plaintiff's own written report produced no protective measure of any kind.

128. The retaliation sequence is chronological and causal: Plaintiff reported sexual assault and sought preservation, protection, and Title IX remedies; DCPS provided no protective measure; the perpetrator's mother complained; and DCPS immediately imposed burdens on Plaintiff, the reporting victim, rather than on the perpetrator. That sequence supports a reasonable inference of retaliatory intent and materially adverse action.

129. The District's later institutional posture toward students who report misconduct, including on information and belief its 2026 adoption of a Student Code of Conduct provision punishing students for "defaming" educators, further evidences a chilling environment and the need for prospective injunctive relief. Plaintiff does not rely on that later policy as an independent damages theory, as the sole retaliatory act, or as the sole

basis for causation for the September 2024 assaults and the events that followed.

130. A causal connection exists between Plaintiff's protected activity and the adverse action. The disparate application of policy described in paragraph 127, in which the complaint against Plaintiff was acted on the same day it was made while Plaintiff's own report produced no protective measure, evidences retaliatory intent. Title IX prohibits such retaliation. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005).

131. As a direct and proximate result, Plaintiff suffered educational and economic harm, including loss of educational access, costs of remediation, and other compensable non-emotional-distress losses available under Title IX, for which she seeks compensatory damages to the extent available, together with declaratory and injunctive relief. Plaintiff does not seek emotional-distress damages under Title IX.

### COUNT VI
### Negligence / Negligent Supervision, Training, and Student Safety
### (Against DCPS; Fla. Stat. § 768.28)

132. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

133. DCPS owed Plaintiff operational duties to exercise reasonable care in supervising students in its custody, including during school transportation, and owed a nondelegable operational duty to provide reasonably safe

student transportation even when transportation services were performed through a contractor. These claims challenge negligent implementation and day-to-day safety failures—including bus supervision, response to a known student-safety incident, implementation of mandatory reporting duties, preservation of known evidence, and implementation of existing safety procedures—not protected discretionary policy judgments.

134. DCPS breached those duties by failing to supervise students during bus transportation; failing to respond to prior notice of the perpetrator's conduct; failing to train, supervise, and direct personnel responsible for handling sexual-misconduct reports; and failing to timely preserve, report, investigate, and remediate the assault.

135. The standard of care owed by DCPS is informed by, among other things, the mandatory child abuse reporting duty imposed by Fla. Stat. § 39.201, the school safety incident reporting duties imposed by Fla. Stat. § 1006.07(9) and Fla. Admin. Code R. 6A-1.0017 (SESIR), and DCPS's own policies. On information and belief, DCPS failed to report Plaintiff's assault as required by these provisions. These violations are evidence of negligence and of breach of the applicable standard of care, and the reporting duties gave DCPS notice of the precise risks its failures created. The District's own Guardian intake form in the substantiated 2020-list investigation likewise answers the question "Was a SESIR completed?"

with "No" and is further evidence of the District's practice of non-reporting.

136. Sovereign immunity for these claims is waived under Fla. Stat. § 768.28, subject to its limitations, and all conditions precedent have been satisfied.

137. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged herein, subject to the statutory limits of Fla. Stat. § 768.28(5).

## COUNT VII
### Negligence / Vicarious Liability and Direct Negligence
### (Against STA and James Roe Bus Driver)

138. Plaintiff realleges and incorporates paragraphs 1 through 87 as though fully set forth herein.

139. STA Bus Driver owed Plaintiff a duty to exercise reasonable care to transport and supervise her safely, including a duty to monitor the interior of the bus and to intervene to prevent foreseeable harm. At all material times, the driver acted within the course and scope of his employment or agency with STA.

140. STA Bus Driver breached that duty by failing to monitor and intervene despite the perpetrator's visible repositioning, the driver's direct interaction with the perpetrator during the assault, his clear view of the seat where the assault occurred with a turn of the head, the known need to monitor students during transportation, and the availability of interior

mirrors or monitoring systems. The assault was foreseeable and preventable through ordinary supervision, making STA vicariously liable for the driver's negligence.

141. STA is vicariously liable for the bus driver's negligence because STA Bus Driver acted within the course and scope of his employment or agency while transporting DCPS students.

142. Separately, STA is directly liable for its own failures to train, supervise, and monitor its drivers; to require monitoring of the passenger compartment; to enforce student-safety protocols; to intervene when students move into unsafe or unauthorized seating positions; and to preserve bus surveillance footage after notice of a serious student-safety incident.

143. As a direct and proximate result of STA's direct negligence and the driver's negligence within the course and scope of employment, Plaintiff suffered the injuries and damages alleged herein. Plaintiff seeks compensatory damages and, as to these non-immune private Defendants, punitive damages only to the extent permitted by Florida law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against the liable Defendants and award relief consistent with each claim, each Defendant's status, and the limitations pleaded above, including:

a. Leave to proceed under pseudonym and an order sealing or restricting identifying information;

b. Compensatory damages against all liable Defendants, in an amount to be determined at trial, subject to the limitations of Fla. Stat. § 768.28(5) as to Defendant DCPS;

c. Emotional-distress and other compensatory damages under the § 1983 counts (Counts I, II, and III);

d. Economic, educational, and equitable relief under the Title IX counts (Counts IV and V), as permitted by law;

e.  Declaratory and injunctive relief requiring DCPS to adopt and implement adequate Title IX compliance procedures, mandatory-reporting protocols, school-safety incident classification and reporting procedures, contractor-oversight and bus-surveillance preservation requirements applicable to DCPS and its transportation contractors, supportive-measure procedures, student-safety training and supervision, and revisions to any policy or practice that chills student reporting of sexual misconduct or places retaliatory burdens on reporting students;

f. Punitive damages against the individual-capacity Defendants and STA to the extent permitted by law, but not against DCPS;

g. An adverse-inference instruction and appropriate sanctions for the failure to preserve evidence;

h.  Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 as to the Section 1983 counts, under Title IX and related equitable authority as to Defendant DCPS, and as otherwise provided by law; and

i.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable under Federal Rule of Civil Procedure 38(b).

Dated: August 6, 2026

Respectfully submitted,

**MOSER LAW PLLC**

/s/ Christina Lawrence-Moser
**Christina Lawrence-Moser**
Florida Bar No. 0563900
Moser Law PLLC
PO Box 840250
St Augustine, FL 32080
Telephone: 904-754-8611
Email: moserlaw@gmail.com
*Counsel for Plaintiff*